281 So.2d 36 (1973)
S.A. RICE and Pauline C. Rice, His Wife, Appellants,
v.
CITY OF FORT LAUDERDALE et al., Appellees.
CASINO REALTY, INC., Appellant,
v.
CITY OF FORT LAUDERDALE, a Municipal Corporation, and Ocean Front, Inc., a Florida Corporation et al., Appellees.
Nos. 71-272 and 71-284.
District Court of Appeal of Florida, Fourth District.
June 29, 1973.
Rehearings Denied July 27, 1973.
*37 Samuel L. Heller, Johnson & Heller, Ft. Lauderdale, for appellants, S.A. Rice and Pauline C. Rice, his wife.
John A. Thabes, Saunders Curtis Ginestra & Gore, Ft. Lauderdale, for appellant and appellee.
Dean Andrews, Ronald B. Sladon, Fort Lauderdale, Attys. for the City of Fort Lauderdale, and Donald H. Norman, Ross, Norman & Cory, Ft. Lauderdale, for appellee, City of Fort Lauderdale.
MAGER, Judge.
This is a consolidated appeal from a final judgment in condemnation. Appellants, S.A. and Pauline Rice,[1] and Casino Realty, Inc., were the defendants below and the City of Fort Lauderdale and State Road Department, as the condemning authorities, were the petitioners below. An action in eminent domain was filed against the defendants under Chapter 74, Florida Statutes, for the purpose of condemning a portion of their property for the widening of U.S. Highway A-I-A in Fort Lauderdale. The subject property consisted of a tract of land with approximately 200-foot frontage on Highway A-I-A on which was situate a restaurant or supper club; petitioners were seeking to condemn the westerly 20 feet of defendants' property.
Defendants hold undivided interests in the fee as well as leasehold interests as follows: (1) The Rices are the owners of an undivided one-third interest and Casino was the owner of the remaining two-thirds interest of the fee; (2) the Rices leased their one-third interest to Casino (Casino Restaurants, Inc., was a sub-lessee of Casino Realty and operated the restaurant on the premises).
Defendants sought damages for the taking and severance damages for the remainder. The claim for damages was based primarily on loss of parking to the restaurant, interference with the egress and ingress and difficulty in getting to related parking. In attempting to establish their measure of full compensation defendants sought to have their lease agreement introduced into evidence and sought to present testimony as to the capitalized value of such lease which the trial court rejected. In arriving at a value of defendants' damages, petitioners' appraisers did not give any consideration to the lease. Defendants also sought to introduce evidence of the cost to cure the taking of the parking area, which the trial court also rejected.
In addition to assigning as error the aforementioned rulings the defendants raised several other points. We have considered and discussed only those points which have merit, except as may be otherwise hereinafter indicated.
At the beginning of the trial defendants requested leave of court to present their case and also requested the right to open *38 and close the case, which requests were rejected by the trial court. We are of the opinion that there is merit to defendants' request notwithstanding the holding of Parker v. Armstrong, Fla.App. 1960, 125 So.2d 138, cert. den., 133 So.2d 321 (Fla. 1961). In Parker, the Second District court held that the right to open and close rests with the condemnor and not with the owner-defendant. The court reasoned that the condemning authority has the duty to come forward with the evidence so that the jury may determine the value of the property taken before a judgment can be obtained on the question of damages, and that having this burden to proceed in the case, condemnor should have the right to open and to close. The Second District referred to an Annotation appearing in 73 A.L.R.2d 618, et seq.: Condemnation  Right to Open and Close, and placed great emphasis upon the "rule in Illinois".
The rationale of Parker, when considered in the context of eminent domain proceedings initiated under Chapter 74 does not preclude the right of an owner to open and close. This is so because there is a distinction between proceedings under Chapter 73 and the procedure authorized in Chapter 74. It is this distinction that mitigates the decision in Parker v. Armstrong, supra. The purpose of Chapter 74 is to allow public agencies to obtain title to and possession of property before the entry of the final judgment. Chapter 74 utilizes what is referred to as a "quick taking" mechanism. An analysis of Parker v. Armstrong, clearly reflects that the court did not construe the "quick taking" procedures under Chapter 74  it could not consider this procedure inasmuch as Chapter 74 was not enacted until 1965 (Parker was decided in 1960).
The difference between the procedures outlined under Chapters 73 and 74 bears directly on the question of which party has the burden of proof. As it is pointed out in 73 A.L.R.2d 618, 619:
"Most of the cases are in agreement that the right to open and close the argument should be accorded to the party upon whom rests the burden of proof, that is, the party who would suffer defeat if no evidence was given on either side".
In pointing out that the distinction between the proceedings under Chapters 73 and 74 and in recognizing the strong arguments to support the view that the owner under certain circumstances should have the right to open and close it is noted in Florida Eminent Domain Practice and Procedure, 2d ed., published by The Florida Bar, Section 7.9:
"1. When the condemning authority employs the procedure authorized by F.S. Chapter 74, which is supplemental to the procedure authorized by F.S. Chapter 73, F.S. Chapter 73 allows all instrumentalities in Florida vested with the power of eminent domain, whether governmental, corporate or individual, to proceed with the acquisition to final judgment. Upon payment of the judgment, title to the land sought to be condemned vests in the condemnor. However, the condemnor may elect not to pay the judgment, and thus waive the right to acquire the property. When the condemnor utilizes the privileges granted by F.S. Chapter 74, however, and deposits its estimate of full compensation in the registry of the court pursuant to an order of taking, it is irrevocably bound to conclude the proceeding. In such a situation, the burden, it is argued, immediately shifts to the owner to show that the estimate does not represent full compensation. The owner therefore, should have the right to open and close.
"2. In all situations when damages are sought over and above the value of the actual land being acquired, such *39 as compensation for business damage, moving costs and particularly severance damages, it is argued that the primary burden rests on the owner. Thus, if the owner fails to establish his claim to these special damages by competent proof, the owner will lose. For this reason, attorneys for the owner assert that the owner should have the right to open and close." (Emphasis added.)
One of the underlying factors in the Parker decision was the so-called "Illinois rule" which permitted the condemnor to open and close. The more recent Illinois decisions have receded from the earlier Illinois cases which were cited in support of the Second District's decision in Parker. See Department of Business & Economic Dev. v. Brummel, 1972, 52 Ill.2d 538, 288 N.E.2d 392; Department of Public Works & Buildings v. Tinsley, 1970, 120 Ill. App.2d 95, 256 N.E.2d 124, and Department of Public Works and Buildings v. Dixon, 1967, 37 Ill.2d 518, 229 N.E.2d 679. In Department of Public Works and Buildings v. Dixon, supra, at p. 681, the court specifically held that under the "quick take" provisions of the Illinois eminent domain act the landowners had the right to open and close argument. The court observed:
"... We are of the opinion, however, that in a condemnation proceeding following the immediate vesting of title (quick-take) the condemnee should have the right to open and close argument. It is he who is seeking just compensation guaranteed to him by the constitution for property over which he has unwillingly lost possession and control and for damages to his remaining land not taken."
See also Village of Penn Yan U.R. Ag. v. Penn Yan Rlty. Corp., 1968, 57 Misc.2d 1033, 294 N.Y.S.2d 66.
Following, therefore, what we believe to be the view supported by a majority of the jurisdictions we conclude that under the "quick-take" condemnation proceedings contained in Chapter 74, Florida Statutes, the landowner-condemnee has the right to open and close. Cf. Department of Business and Economic Dev. v. Brummel, supra. On this basis alone, the final judgment must be reversed for a new trial.
As heretofore indicated there are, however, several additional points which merit further discussion and which must be considered in connection with any further proceedings to be conducted before the trial court.
Defendants contend that the trial court erred in refusing to hear evidence on the availability of a parcel of land adjoining the subject property; defendants theorize that the loss of the parking spaces necessitated the acquisition of the adjoining land in question and that the jury should have been permitted to consider the cost of such adjoining land under the "cost to cure" approach in the determination of damages to the defendants occasioned by the condemnation. A full discussion of the "cost to cure" approach to measure the damages to the remainder of property after there has been a taking is set forth in Hill v. Marion County, Fla.App. 1970, 238 So.2d 163.
While it would seem that a jury, in determining the value of property remaining after a taking has occurred, could consider evidence of the cost of adjoining property to be used as a substitute for the property taken in order to cure the problems of parking, egress and ingress, etc., the evidence in the case sub judice was properly excluded. The evidence which defendants sought to introduce in furtherance of their "cost to cure" approach was an offer by the owner of the adjoining property as to the price for which she would sell her property to the defendants. The evidence was properly excluded not because it was inconsistent with the "cost to cure" theory but rather on the basis that the proper predicate had not been established *40 and that such offer was merely speculative in nature. The comments in Nichols on Eminent Domain, 3d ed., vol. 5, Sec. 21.4(3), support the exclusion of this type of evidence:
"If evidence of the price of similar land is to be admitted, the rule is firmly established that it must be confined to the amount actually paid in a completed transaction. Mere offers, whether made by the owner of such land or to him, are inadmissible. The objections to the reception of evidence of offers to buy the identical land which is taken are multiplied tenfold in the case of other land in the neighborhood, and if offers for neighboring land were competent, the trial of a land damage case would degenerate into a confused and endless wrangle in which collateral issues and what is, in substance, hearsay evidence would play the most prominent part. Doubtless under certain conditions evidence of a bona fide offer might have some probative value, but the safest course is to exclude such evidence altogether, except perhaps when it can be used to contradict an expert witness, by showing that he himself has made an offer for neighboring land inconsistent with his present testimony."
Defendants also contend that the trial court erred in refusing to admit into evidence appellants' lease agreement and testimony as to the capitalized value of the lease at the time of taking. The agreement embodies the leasing by the defendants Rice of their undivided one-third interest to defendant Casino (who is the fee owner of the remaining undivided two-thirds interest). The case law reflects that consideration of the leasehold interest has been concerned primarily with the interest of the lessee rather than the lessor. There are, however, some very pertinent comments in Nichols on Eminent Domain, Vol. 4, 3rd ed., Sec. 12.3122:
"Rent as Criterion for Value

"When property is leased, the rent is derived almost entirely from the property, although, of course, a landlord can sometimes get more than the fair rental value from a tenant who has established a profitable business on the property, and who will pay a high price for renewal of his lease rather than incur the expense and loss of custom incident to a removal. However, as a safe working rule, if property is rented for the use to which it is best adapted, the actual rent reserved, capitalized at the rate which local custom adopts for the purpose, forms one of the best tests of value, and accordingly evidence of the rent actually received at a time reasonably near the punctum temporis of the taking, should be admitted. As stated above the acceptance of rental value is predicated on the assumption that the rent is received by reason of the best available use to which the property may be put. Such rentals must furthermore be free of any taint of collusion between landlord and tenant."
Cf. State Road Department v. Bramlett, Fla. 1966, 189 So.2d 481; Orange State Oil Co. v. Jacksonville Express. Auth., Fla. App. 1959, 110 So.2d 687.
The fact that the lease embraced only a portion of the fee (Rices' one-third interest) does not, in our view, preclude consideration of the lease agreement in determining the value of the damage to the interest of defendant Rice. Furthermore, the evidence relating to the exercise by defendant Casino (lessee) of the option to renew was probative of the value of the lease and was a matter that the jury was entitled to consider. See State Road Department v. Tampa Bay Theaters, Inc., Fla.App. 1968, 208 So.2d 485.
Lastly, defendants contend that the trial court erred in refusing to instruct the jury to return separate verdicts for each owner, i.e., for the defendants Rice as owners of a one-third interest, and for the defendant Casino as the owner of a two-thirds interest. The thrust of defendants' contentions is predicated upon the wording of the eminent domain section appearing in *41 the 1968 revision of the Florida Constitution as compared with the language of the eminent domain section in the former Constitution of 1885.
Prior to the 1968 revision the eminent domain section relating to compensation to be paid to the property owner provided as follows:
Art. XVI, Sec. 29.  "No private property, nor right of way shall be appropriated to the use of any corporation or individual until full compensation therefor shall be first made to the owner, or first secured to him by deposit of money; which compensation, irrespective of any benefit from any improvement proposed by such corporation or individual, shall be ascertained by a jury of twelve men in a court of competent jurisdiction, as shall be prescribed by law."
In 1968 the eminent domain section was revised, as follows:
Art. X, Sec. 6.  "(a) No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner."
It is well to point out that a provision that private property should not be taken for public use without full compensation has been a part of Florida's organic law since 1838. Our review of the history of the adoption of the 1968 revision reflects the intention of the framers and adopters that each owner of any interest in the condemned property would be entitled to compensation. See In re Advisory Opinion to Governor, Fla. 1971, 243 So.2d 573. The use of the phrase "each owner" in the 1968 revision was intended to provide separate damage award where differing ownerships exist in the parcel subject to condemnation. Under the language of Article X, Section 6, supra, each of the defendants as owners of separate interests in the subject property was entitled to separate jury verdicts.
In light of the foregoing the Final Judgment of Condemnation is reversed and the cause remanded for further proceedings consistent with this opinion.
CROSS and OWEN, JJ., concur.
NOTES
[1] Under the Florida Appellate Rules it is the obligation of counsel, when making reference to matters that have transpired in the trial proceeding, to support such allegations and representations with reference to the pages of the original record. Inaccurate or erroneous record references are tantamount to no references. This court's review of many of the matters contained in the brief of appellant-Rice was greatly hampered by the fact that the page references to the original record were inaccurate. Rather than strike the brief of appellant-Rice, with directions to correct such inaccuracies, this court in the exercise of its discretion and in furtherance of expediting pending appeals has proceeded to dispose of the case on the merits. This action should not be interpreted by the bench and bar as indicating that we will not under some other circumstances strike a brief or dismiss an appeal when appellant has failed to comply with the requirements of the Florida Appellate Rules. Cf. Gregg v. State Road Department, Fla.App. 1962, 140 So.2d 328.